IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| J.V.P. by and through his parent and Guardian K.V.P., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No: 4:22-cv-00558-BP |
| State of Missouri Board of Education, and | ) ) | |
| The Missouri Department of Elementary and Secondary Education, | ) ) ) | |
| Defendants. | ) | |

## **PLAINTIFFS' REPLY SUGGESTIONS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Plaintiffs J.V.P. and K.V.P. respectfully file their Reply Suggestions in Further Support of Their Motion for Summary Judgment and in response to Defendants' Suggestions in Opposition to Plaintiffs' Motion for Summary Judgment.

### **Reply to Defendants' Response to Plaintiffs' Statement of Material Facts**

Defendants fully admitted to the following statements of material fact: 1-5, 7-8, 12-31, 33-35, 37-39, 41, 43-45, 52-59, 61-65, 68, 70-72, 74-77, 80-82, 85-88, 92-98, 100-101, 103-105, 122, 124-126, 128-136, and 138-39. Defendants admitted to the following statements of material facts with clarifications (in part because of errors in their interrogatory responses), and Plaintiffs agree to the clarifications: 9, 10, and 43. Defendants also provide clarifications/corrections that Plaintiffs accept: 50, 51, 89-91, 99, and 123.

1

In response to numerous statements of uncontroverted facts, Defendants reply "Admitted that Plaintiffs allege this," "Admitted that this statement was made," or a substantially similar response. Pursuant to Local Rule 56.1, "If the opposing party controverts a given fact, it must properly support its denial in accordance with Fed. R. Civ. P. 56(c). Unless specifically controverted by the opposing party, all facts set forth in the statement of the movant are deemed admitted for the purpose of summary judgment." As Defendants do not specifically controvert any of the statements with the above-mentioned phrases, Plaintiffs understand that these facts (Nos. 6, 40, 67, 73, 106-108, 110-114, 117-120, 127, 137, and 140[1]) are deemed admitted.

**Additional responses to Defendants' failure to admit facts:**

11. Defendant Missouri Department of Elementary and Secondary Education (DESE) provides funding for AEL. Deposition of Michelle Woods (Woods Dep.) 13:5-7.

Response: "Admit in part. DESE administers funding for AEL."

Reply: However, DESE's Chief Operations Officer answered "Yes" when asked "So does DESE provide funding for adult education?" Woods Dep, 13:5-7.

32. The amount expended on a given program ranges from about $50,000 to $1,500,000. Wadley Dep. 71:5-9.

Response: Admit in part. This is the range of amounts administered on a given program by DESE.

---

[1] Plaintiffs also accept Defendants' clarification that the term Department refers to DOC and not DESE in the statement of material fact.

Reply: It is unclear why the admission is only in part.

36. DESE has seven staff individuals whose job responsibilities are devoted to adult education.

Wadley Dep., 4:19-25.

Response: Denied. The cited testimony does not reflect this statement,

Reply: Plaintiffs provided the incorrect citation. The correct citation is Wadley Dep., 8:19-22. Ms. Wadley states that she oversees six other individuals regarding adult education, so the total number of staff individuals, including Wadley, is seven. Defendants do not appear to dispute this fact, only the citation.

46. Defendants' response to Interrogatory 3.A.3 explains Missouri's adult education standards.

Defendants' Responses to Interrogatories, 3.A.3; Narrative Report for Missouri 2021, at headline "Adult Education Standards," available at https://nrs.ed.gov/rt/mo/2021/narrative-report (last accessed Aug. 16, 2023) (Provided as Attachment 17).

> The Missouri Adult Education and English Language Development Standards align closely with the K-12 College and Career Readiness Standards (CCRS). The Missouri Adult Education Standards, much like the K-12 standards, provide a framework within which programs can develop the curriculum needed to prepare students to achieve their goals. These goals include obtaining employment, enrolling in post-secondary options, and developing language and life skills needed to be a part of the culture of the United States. Missouri's Adult Education Standards offer guidance in academic areas such as applied math, reading comprehension, communication (verbal, written, and listening), critical thinking and problem-solving, technology, and gathering/evaluating information.

> Additionally, programs support work readiness skills such as career development and planning, professional behavior, accountability, interpersonal skills, and self-management.

3

In Missouri, the basis of all adult education, literacy, and English language acquisition activities must be the CCRS. Local providers must incorporate CCRS into their instruction and participate in professional development related to CCRS. DESE AEL carefully reviewed its CCRS workshop requirements and discovered they were ineffective and outdated. Instead of one focused CCRS PD opportunity, DESE used state and local program staff to revise all workshops, incorporating the standards into each. In the future, all DESE-sponsored PD opportunities will include applicable portions of CCRS encouraging instructors to incorporate them into all lessons.

Response: Denied. Interrogatory 3.A.3 asked about reporting requirements and nothing about education requirements. Further it is exceptionally unclear what the asserted "material fact" is here.

Reply: The interrogatory quotes from a website that Defendants provided in response to Interrogatory 3.A.3. Defendants did not dispute that the quotation is accurate.

47. Notably, Missouri regulations define the K-12 College and Career Readiness Standards ("CCRS") at Mo. Code Regs. Ann. tit. 5, § 20-100.105, Appendix A.3.

Response: Denied. This is not the current regulation in effect. 5 CSR 20-100.125 is the current regulation that now contains the standards relevant to CCRS. 5 CSR 20-100.125.

Reply: Plaintiffs cannot verify Defendants' assertion that there has been a change in the relevant standards. On Missouri's website, these are still found at Mo. Code Regs. Ann. tit. 5, § 20-100.105, Appendix A.3. https://www.sos.mo.gov/CMSImages/AdRules/csr/current/5csr/5c20-100.pdf, last accessed Sept. 26, 2023. In any case, Defendants have not disputed the definition of CCRS cited here.

48. This regulation confirms that school district performance in accordance with this rule and the standards is reviewed annually by DESE. Mo. Code Regs. Ann. tit. 5, § 20-100.105 at 2.

4

Response:  Denied.  As of June 30, 2020, 5 CSR 20-100.125 is the applicable regulation.  5 CSR 20-100.125.

Reply:  Plaintiffs cannot verify Defendants' assertion that there has been a change in the relevant standards. On Missouri's website, these are still found at the location cited by Plaintiffs. https://www.sos.mo.gov/CMSImages/AdRules/csr/current/5csr/5c20-100.pdf, last accessed Sept. 26, 2023. In any case, Defendants have not disputed the content of the regulation.

49.  This regulation establishes that the state of Missouri set performance standards (the CCRS) that are used for adult education.  Mo. Code Regs. Ann., tit. 5, § 20-100.105, Appendix A-3.

Response:  Denied.  As of June 30, 2020, 5 CSR 20-100.15 is the applicable regulation.  It does not pertain to performance standards. 5 CSR 20-100.125.

Reply: Plaintiffs cannot verify Defendants' assertion that there has been a change in the relevant standards. On Missouri's website, these are still found at the location cited by Plaintiffs. https://www.sos.mo.gov/CMSImages/AdRules/csr/current/5csr/5c20-100.pdf, last accessed Sept. 26, 2023. In any case, Defendants have not disputed the content of the regulation.

60.  The assistant director in charge of performance has oversight responsibility for validating and monitoring data.  [Wadley Dep.]: 9:6-24.

Response: Admitted though citation is inaccurate.

Reply:  Wadley identified the assistant director responsible for performance as Kathy Bamyl. Wadley Dep., 9:6-8.  She explained that Bamyl is the data expert. *Id.* at 9-11.  She then explained

5

that Bamyl's position included oversight of "validating and monitoring the data." *Id*. at 21-24. Thus, the citation was accurate.

66. DESE's assistant director in charge of performance has responsibility for validating and monitoring data. [Wadley Dep.] at 9:6:24.

Response: Admitted. Incorrect citation.

Reply: As noted in response to No. 60, Wadley explained that Bamyl's position included oversight of "validating and monitoring the data." Wadley Dep. at 9:21-24. Thus, the citation was accurate.

69. DESE's assessment of adult education includes the five core indicators of performance, called measurable skill gains, which could be measured five different ways. [Wadley Dep.] at 31:17-21.

Response: Admitted in part. The testimony indicates that measurable skill gain is one of the five indicators of performance, not the name of the set of all five.

Reply: The testimony speaks for itself.

78. Monitoring includes site visits by a team, which typically includes the assistant director of compliance and two or three other staff. [Wadley Dep], at 6:29.

Response: Admitted. Citation is incorrect.

Reply: The correct citation is: Wadley Dep. 29:17-25, 30:1

6

79: DESE has the authority to sanction programs by withdrawing their funding. *See, e.g.* Wadley Dep., 16:3-6.

Response: Admitted. Citation is incorrect.

Reply: The correct citation is Wadley Dep., 17:3-6.


83: If issues persist during a formal monitoring, DESE institutes a corrective action plan for the program. [Wadley Dep.] at 15:18-20.

Response: Admitted. Citation is incorrect.

Reply: Wadley testified that "if during a formal monitoring those issues still exist, then we do a corrective action plan." Wadley Dep. at 15:18-20. The citation is correct.


84. DESE has the option to cancel any contracts with programs if they fail to respond to a correction action plan. [Wadley Dep.] at 16:3-6.

Response: Admitted. Citation is incorrect.

Reply: The correct citation is 17:5-6.


102. One goal of Missouri's adult education programs is to pay the high school equivalency exam. Wadley Dep., 33:7-16.

Q. Is one of your goals to help students get a high school -- pass high school equivalency exam -- pass the high school equivalency?

A. If that's the student's goal, then that's our goal. So our goals are what the students goals are. We don't -- on the adult education programs that are funded by WIOA adult education, don't administer the high school equivalency but a lot of times that is the goal of our students, yes.

Response: Denied. The answer indicates that the programs are whatever the students are.

7

Reply: The answer clearly indicates that 1. DESE's goal will be to help students pass the high school equivalency goal "If that's the student's goal" and 2. That passing the high school equivalency exam "a lot of times that is the goal of our students." Defendants cannot reasonably argue that passing the high school equivalency exam is not a goal of AEL in light of these statements. Defendants do not offer any evidence to contradict this fact.

109. The programs are administered by both DSS and DESE. Heimericks Dep., 55:24-25 and 56:1-14.

Response: Denied. DESE does not administer Excel Adult High Schools. Ex A – Declaration of Megan Wadley, ¶3.

Reply: It appears that Defendants are arguing that DESE's authority to administer the Excel Centers moved over to DSS on August 28 – after Plaintiff's Suggestions were filed, but before Defendants replied. Both DESE and DSS are state agencies, however, so in both cases this is state administration of adult high school as discussed in the argument within.

115. DESE is responsible for licensing teachers at the Excel adult high schools. Heimericks Dep., 19:5-12.

Response. Denied. DESE is not responsible for licensing teachers at Excel Adult High Schools. Ex. A – Declaration of Megan Wadley, ¶¶ 12, 14.

Reply: It appears that Defendants are arguing that DESE's responsibility to license teachers at the Excel Centers moved over to DSS on August 28 – after Plaintiff's Suggestions were filed, but before Defendants replied. Both DESE and DSS are state agencies, however, so in both cases this is state administration of adult high school as discussed in the argument within.

8

116.  Both DESE and DSS are parties to the contract with Goodwill for operating the Excel High School program because both agencies have responsibility for overseeing the contract.  Heimericks Dep., 56:1-14.

Response:  Denied. DESE is no longer a party to the Excel High School program contract. DESE has no responsibility to oversee the contract – Declaration of Megan Wadley, ¶¶ 12-14.

Reply:  It appears that Defendants are arguing that DESE's responsibility for overseeing the contract with the Excel Centers moved over to DSS on August 28 – after Plaintiff's Suggestions were filed, but before Defendants replied. Both DESE and DSS are state agencies, however, so in both cases this is state administration of adult high school as law as discussed in the argument within.

121.  Individuals in the Department of Corrections (DOC) are required to participate in adult education if they do not already have a high school diploma or equivalency.  Wadley Dep., 45:18-23.

Response:  Admitted.  Incorrect citation.

Reply:  Wadley testified, "If they do not have their high school diploma or equivalency, yes, it's my understand that it [participation in adult education] is required."  Wadley Dep., 45:18-23. The citation is accurate.

## Response to Defendants' Statement of Additional Facts

As a preliminary matter, many of these facts asserted are identically or substantially identical to Defendants' Statement of Uncontroverted Material Facts, as laid out in Doc. 99

Case 4:22-cv-00558-BP   Document 110   Filed 10/03/23   Page 9 of 28

starting at page 2. Plaintiffs have already responded to these facts but respond again here for the Court's convenience.

1. Students in Missouri only have a right to education up to age 21. Mo. Const. art. IX, § 1(a).

Response: Plaintiffs deny. To the extent that Defendants claim that Missouri students who are 21 years of age, but not yet 22, do not have a legal right to education, Defendants are mistaken. *See* Doc. 97 ¶¶ 9-140. That is a legal conclusion that is the subject of this case, and the entirety of Plaintiffs' Suggestions in Support of Summary Judgment refute this claim but see particularly Suggestions (Doc. 97) p. 24-27. To the extent that Defendants are asserting that students age 21 before their 22nd birthday are entitled to education, Plaintiffs agree. The Missouri Constitution, as cited by Defendants, states "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the general assembly shall establish and maintain free public schools for the gratuitous instruction of all persons in this state within ages not in excess of twenty-one years as prescribed by law." Mo. Const. art. IX, §1(a). This provision supports Plaintiffs' proposition that students who are age 21, but not yet age 22, are entitled to free public education in Missouri. Missouri's practice of providing adult education to students, as discussed in Plaintiffs' Suggestions, proves that students with disabilities in Missouri have a legal right to education until their 22nd birthday in accordance with federal law. *See* 20 U.S.C. § 1412(a)(1)(A).

2. School attendance is mandatory in Missouri only until the age of 17. 167.031, RsMO.

Response: Plaintiffs admit. However, this fact is not relevant to the case.

10

3. Plaintiff J.V.P. turned 22 on August 29, 2023. (Doc. 21, ¶7).

Response: Plaintiffs admit.

4. AEL services are funded by the U.S. Department of Education through the Workforce Innovation and Opportunity Act (WIOA). Missouri matches those federal funds as required by WIOA with state funds contributed from general revenue. Ex. A - Declaration of Megan Wadley, ¶2.

Response: Plaintiffs admit that Missouri receives funding from the federal government though WIOA. To the extent that Defendants are claiming *all* funding for AEL services comes from the federal government, Plaintiffs deny. In her declaration, Wadley states "Missouri matches those federal funds as required by WIOA with state funds contributed from general revenue." Dec. 105-1, ¶2.

5. AEL programs are monitored by DESE. DESE administers a grant competition for service providers outlined by the federal government. DESE then ensures the programs that are awarded funding meet the standards set by the WIOA. Ex. A – Declaration of Megan Wadley, ¶3

Response: Plaintiffs admit.

6. DESE management of AEL programs is limited to drafting the applications used to request grant funds, scoring applications, and allocating the funding based on the scores. Ex. A- Declaration of Megal Wadley, ¶4.

Response: Plaintiffs deny. Defendants offer an unreasonably narrow definition of "management" here that conflicts with Defendants' prior responses. DESE's management of AEL includes the items listed as "oversight" here, including "monitoring the expenditure of funds, reimbursing expenses, ensuring teachers are certified, ensuring regulatory compliance, providing professional development for staff, maintaining student demographic data, and developing various programs to meet the needs of different communities[,]" and reporting performance data to the federal government. Defendants' Exhibit 1 to Defendants' Motion for Summary Judgment ¶3 (Doc. 99-1). Defendants also manage the following: program monitoring, technical assistance, partnership development, assessment tools, statewide strategic planning, and statewide policies. Defendants' Responses to Interrogatories, Interrogatory #2 (Doc. 97 ¶28). Defendants further ensure that AEL programs align with the College and Career Readiness Standards (CCRS). Wadley Dep. 24:7-22 (Doc. 97 ¶43). DESE recently revised all of its workshops to include applicable portions of these CCRS. Defendants' Responses to Interrogatories, Interrogatory 3.A.3; Narrative Report for Missouri 2021, at headline "Adult Education Standards," available at https://nrs.ed.gov/rt/mo/2021/narrative-report (last accessed Aug. 16, 2023) (Doc. 97 ¶50). Further examples of DESE's management—such as would require an entire rehashing of Plaintiffs' statement of facts—are documented in Plaintiffs' Suggestions. E.g. Doc. 97, ¶¶22-85, 95-105, and 121-140.

12

7. DESE oversight of AEL programs, as required by federal law, consists of monitoring the expenditure of funds, reimbursing expenses, ensuring teachers are certified, ensuring regulatory compliance, providing professional development, maintaining student demographic data and developing various programs to meet the needs of different communities. Ex. A – Declaration of Megan Wadley, ¶ 4.

Response: Plaintiffs admit. Note however that this is not the full extent of DESE's oversight. *See, e.g.,* Doc. 97, ¶¶ 22-85, 95-105, and 121-140.

8. DESE reports to the federal government, which monitors DESE and audits its compliance. Ex. A – Declaration of Megan Wadley, ¶5.

Response: Plaintiffs admit.

9. DESE reports performance data to the federal government. Grant competitions, monitoring, reporting and technical assistance offered to AEL programs by DESE are federally require. *Id.*

Response: Plaintiffs admit that some grant competitions, monitoring, reporting, and technical assistance offered to AEL programs by DESE are federally required.

10. To determine allocations for services, DESE must follow the guidance outlined in WIOA Section 231 (page 194), including the 13 considerations described in 231€. Ex. A - Declaration of Megan Wadley, ¶6.

Response: Plaintiffs partially deny. This guidance only applies for "funds made available under section 222(a)(1) for a fiscal year." WIOA Section 231 (page 194), available at:

https://www.govinfo.gov/content/pkg/PLAW-113publ128/pdf/PLAW-113publ128.pdf. As discussed elsewhere, Missouri could decline to accept federal funding by not submitting a unified State plan. *See* 29 U.S.C.A. § 3112(a). Thus, DESE only "must" follow this guidance because Missouri has voluntarily accepted federal funding to provide adult education.

11. WIOA Section 223 (page 191) requires DESE to align AEL activities with other core programs, establish high-quality educator professional development, provide technical assistance to providers, and monitor/evaluate the quality and improvement of AEL activities. *Id.*

Response:  Plaintiffs partially deny. Again, this guidance only applies if and because Missouri has voluntarily accepted federal funding to provide adult education. *Id.*

12. Section 223 also describes permissible State-level activities, including developing content models, curricula dissemination, assistance for program development, and others. Ex. A – Declaration of Megan Wadley, ¶7.

Response:  Plaintiffs admit.

13. In addition, DESE ensures that providers meet the requirements stated in 5 CSR 20-400.630 regarding certification for adult educators. Ex. A – Declaration of Megan Wadley, ¶8.

Response Plaintiffs admit.

14. Federal reporting of student outcomes to the National Reporting System (NRS) is

14

required by [34 CFR 462](#) and [WIOA Section 116](#) (page 49). *Id.*

Response:  Plaintiffs partially deny.  Again, this guidance only applies if and because Missouri has voluntarily accepted federal funding to provide adult education.  *Id.*

15. DESE utilizes the LACES student data system because it aligns with NRS reporting requirements. *Id.*

Response Plaintiffs admit.

16. Depending on the student, the educational objective of AEL programs range from preparing a student for a high school equivalency test to learning English. Ex. A – Declaration of Megan Wadley, ¶9.

Response:  Plaintiffs admit that the educational objective of AEL programs includes preparing a student for a high school equivalency test and learning English.

17. [WIOA Section 223 (I)](#) (page 192) outlines that curriculum frameworks must align with state adopted academic standards, such as the CCRS in Missouri. *Id.*

Response: Plaintiffs deny. This section states that curriculum frameworks must "take into consideration … State adopted academic standards." WIOA Section 223 (I) (page 192). It is not clear that this section requires these frameworks to "align with" those standards, or that it requires Missouri to adopt CCRS. Further, this section indicates that Missouri is permitted to impose its own standards: "Whenever a State or outlying area implements any rule or policy relating to the administration or operation of a program authorized under this title that has the effect of imposing a requirement that is not imposed under Federal law (including any rule or

15

policy based on a State or outlying area interpretation of a Federal statute, regulation, or guideline), the State or outlying area shall identify, to eligible providers, the rule or policy as being imposed by the State or outlying area." *Id.* p. 192-193. It is not clear if the CCRS are adopted pursuant to this rule, or if Missouri even complies with this requirement to identify rules or policies that are imposed by the State as opposed to the federal government.

18.  WIOA Integrated English Literacy and Civics Education programs in Missouri are solely funded by the U.S. Department of Education through the WIOA. Ex. A – Declaration of Megan Wadley, ¶10.

Response:  Plaintiffs admit that these funds ultimately derive from the federal government, and note that Defendants distinguish these services from AEL services. Defendants' Ex. A – Declaration of Megan Wadley, ¶10.

19. DESE ensures that these programs are complying with relevant federal regulations. *Id.*

Response:  Plaintiffs admit.

20. Excel Centers are a product of recent state legislation. That legislation required DESE to issue a Request for Proposal (RFP). Ex. A – Declaration of Megan Wadley, ¶12.

Response:   Plaintiffs admit.

21. MERS Goodwill won the RFP bid and now operates the Excel Centers. *Id.*

Response:   Plaintiffs admit.

16

22. DESE has no involvement with funding adult education services for the Excel Centers. DESE's authority over the Excel Centers existed only to the extent it administered the RFP. *Id.*

Response: Plaintiffs deny. Both DESE and DSS are parties to the contract for operating the Excel Centers. Heimericks Dep., 55:19-25. This indicates DESE's involvement with the funding contained therein.

23. Excel Centers are operated privately by MERS Goodwill. *Id.*

Response: Plaintiffs admit.

24. In August 2023, Senate Bill 199 (https://senate.mo.gov/23info/BTS_Web/Bill.aspx?SessionType=R&BillID=44612), amended 160.270 RsMO to transfer all RFP, contract, and operation of Excel Centers to Department of Social Services. Ex. A – Declaration of Megan Wadley, ¶13.

Response: Plaintiffs admit.

25. As advertised on the Excel Center website (https://excel.mersgoodwill.org/about-excel-center/), their accreditation comes from the Missouri Nonpublic School Accrediting Association (MNSAA), which is not a state agency. Ex. A – Declaration of Megan Wadley, ¶14.

Response: Plaintiffs admit that Excel Center employees may be accredited by the MNSAA.

26. Educators at the Excel Centers may have obtained certification; but DESE is not

responsible for ensuring certification of Excel Center educators is appropriate, current, or accurate. Id.

Response: Plaintiffs admit.


**Plaintiffs' additional statements of fact**

1. E.S., M.S, and M.T. and their parents J.L. and L.T. have moved to intervene in this case. J.L. Declaration (J.L. Dec.), ¶ 2, ¶, L.T. Declaration (L.T. Dec.), ¶ 2.

2. In addition, C.S, D.S., Me. S, and their mother and next friend J.L and M.K. and her parents and legal guardians R.K. and A.K. also seek to intervene. J.L. Dec., ¶29; A.K. Declaration (A.K. Dec.)., ¶2.

3. E.S. is 19 years old as of May 2023, and M.S. is 18 years old as of February 2023. J.L. Dec., ¶¶ 4, 14. They are sisters and reside with their mother in Eureka, Missouri and attend High School, which is in the Rockwood School District, which partners with the St. Louis Special School District to provide special education and related services to students with disabilities. J.L. Dec., ¶¶ 4-5, 14-15.

4. E.S. has an IEP and receives special education and related services under the category of Intellectual Disability. J.L. Dec., ¶ 6. She has medical diagnoses of Down Syndrome, Autism, ADHD, ODD, OCD, Reactive Attachment Disorder, Mood Dysregulation Disorder (DMDD) and celiac disease, among other things. *Id.*

5. E.T. loves school. She enjoys singing and dancing. She is a hard worker when she wants to do something. She participates in Sparkle Nation Cheer and Dance. J.L. Dec., ¶7.

6. E.S. will turn 21 in May 2025, and her special education services will end before her 21st birthday because school is scheduled to end that year before her 21st birthday. J.L. Dec.,

¶ 8.  She would benefit from continuing to receive special education until her 22nd birthday.  *Id.*

7.  In the St. Louis area, almost all programs for adults with disabilities have a two-year waiting list, and the programs only allow parents and students to sign up for the waiting list until their official graduation year.  J.D. Dec., ¶ 9.

8.  E.S. is currently making progress in school in changing/modifying/regulating behaviors that could be problematic in adult life.  J.L. Dec., ¶ 10.  Her mother is concerned that her current behaviors may prevent her from being considered for many adult programs, including both supported employment and day programs.  *Id.* With an additional year of education that may enable her to make additional progress on these behavioral concerns, she may have additional adult services options. *Id.*

9. E.S. uses alternatives to guardianship/supported decision-making for making decisions regarding her education and her legal needs, among other things. J.L. Dec., ¶11.  Her mother J.L. assists her in decision-making. *Id.*

10. E.S.'s disabilities adversely affect her educational performance. J.L. Dec., ¶12. Because of her disabilities, Plaintiff-Intervenor E.S. will not be able to earn a regular high school diploma. *Id.*

11. M.S. is friendly and kind and loves music and dancing. Plaintiff M.S. loves school and is part of the Sparkle Nation Cheer Squad. J.L. Dec., ¶16.

12. M.S. has an IEP and receives special education and related services under the category Intellectual Disability. J.L. Dec., ¶17.  She has a medical diagnosis of Down Syndrome and Intractable Epilepsy, among other things. *Id.* IEP identifies her areas of need as language

19

semantics and pragmatics, written expression, reading, math, independent living (self-care) and job skills. *Id.*

13. M.S.'s disabilities adversely affect her educational performance. J.L. Dec., ¶18. Because of her disabilities, Plaintiff-Intervenor M.S. will not be able to earn a regular high school diploma. *Id.* Plaintiff-Intervenor M.S., at age 18, is entitled to transition planning services to assist her in achieving postsecondary goals and receiving the transition services needed to reach those goals. *Id.*

14. M.S. will turn 21 in February 2026. J.L. Dec., ¶19. She would benefit from continuing to receive special education until her 22nd birthday. *Id.*

15. J.L. wants both her daughters, E.S. and M.S. to continue to receive special education until their 22nd birthdays. J.L. Dec., ¶ 20.

16. It is important for J.L. to know if E.S. and M.S. will be able to attend school until their 22nd birthday as we work with the school district on developing appropriately ambitious goals and challenging objectives in their IEPs this year. J.L. Dec., ¶21.

17. J.L. first learned of this lawsuit in September 2023 and contacted undersigned counsel for the first time on September 9, 2023. J.L. Dec., ¶22.

18. J.L. is also the parent of C.S., who is 22 years of age, D.S. who is 22 years of age, and Me. S., who is 21. J.L. Dec., ¶25. . All three had their special education and related services terminated prior to their 22nd birthday. *Id.* J.S. and her children seek compensatory education to make up for the services that they should have received if Missouri complied with federal law and provided special education and related services until students turned 22. *Id.*, ¶30.

19. M.T. is 16 years old as of May 2023, and she and her mother live in Rocheport, Missouri. L.T. Dec., ¶4.

20. M.T. is currently in her junior year at Rock Ridge High School, a public school operated by Columbia Public Schools. L.T. Dec., ¶5.

21. M.T. has a great personality and loves music in the classroom and enjoys listening to books being read aloud. L.T. Dec., ¶6.  She enjoys going to school and is making educational progress. *Id.*

22. M.T. has been diagnosed with cerebral palsy, blindness, focal epilepsy, diabetes insipidus, and intellectual disability, among other things. L.T. Dec. ¶7.

23. M.T. has an IEP and receives special education and related services pursuant to her IEP. L.T. Dec., ¶8.

24. M.T.'s disabilities affect her educational performance, and, as result, she will not be able to earn a regular high school diploma. L.T. Dec., ¶9.

25. M.T.'s mother believes that it is important for her daughter to receive special education and related services until her 22nd birthday.  L.T. Dec., ¶14.

26. M.T. first  of this pending lawsuit in August 2025, and she contacted undersigned counsel for the first time on August 25, 2025. L.T. Dec., ¶13.

27. M.K. is 20 years old as of August 2023 and lives with her parents, who are her legal guardians, in the Ladue School District, which partners with the Special School District of St. Louis County for special education and related services for students with disabilities.  A.K. Dec., ¶ 4.

28. M.K. has an IEP.  She receives special education and related services under the category of Autism.  She has a medical diagnosis of Fragile X Syndrome. A.K. Dec. ¶5.

29. M.K. currently attends the Vocational Skills Program at SSD Central Offices five days a week. A.K. Dec. ¶ 6.

30. M.K. loves school. She is very sociable. She loves to play field hockey, and one highlight in her high school years was scoring a goal for the Ladue High School field hockey team. AK. Dec., ¶7.

31. M.K. will turn 21 in August 2024, and, according to her school district's policy, she will be able to finish the semester and her special education and related services will end on Dec. 31, 2024. A.K. Dec. ¶8.

32. M.K. would benefit from continuing to receive special education until her 22nd birthday. *Id.*

33. M.K.'s goal is to work in customer service or as a volunteer store greeter and to eventually live independently with support. She wants to continue to play sports, especially field hockey. A.K. Dec. ¶9.

34. An additional year of the Vocational Skills Program at the SSD Central Office would assist M.K. in learning to become more independent in doing her job tasks, her self-care skills, her safety awareness, and her communication. A.K. Dec. ¶ 10.


## ARGUMENT

The parties agree that this case presents a legal issue and that summary judgment is appropriate. Plaintiffs have demonstrated that summary judgment should be entered in their favor.

I.  **Plaintiff' Claim Is Not Moot, and, in Any Event, Proposed Plaintiffs-Intervenors E.S., M.S., C.S., D.S., Me. S, M.T. and A.K.  and their Parents J.L., L.T., A.K. and R.K. Have Claims that are Not Moot**

Plaintiffs have already provided the court with a memorandum explaining that this case is not moot in Plaintiffs' Response to Order to Show Cause (Doc. 100) and have responded to Defendants' Motion for Summary Judgment, which argued mootness. Doc. 99, at 5-7.  For the sake of simplicity, Plaintiffs incorporate those Responses here. Defendants' contention that Plaintiffs' claims are moot because J.V.P.'s birthday is August 29, 2023 and that, therefore, declaratory and injunctive relief is not available to him is simply wrong. Doc. 99, at 6. In fact, declaratory relief and injunctive relief would enable Plaintiff to obtain compensatory education. The Complaint included a request for additional relief as the Court finds just and appropriate. Doc. 1, at 13. In their Response, Plaintiffs made clear that they are seeking compensatory education.  *See* Plaintiffs' Response to Order to Show Cause, p. 8 (Doc. 100).[2]

Defendant appears to suggest that the compensatory claim would be against a non-party, presumably, J.V.P.'s local educational agency, Grandview. Doc. 105, at 41.  But courts have ordered compensatory education in virtually identical cases against state educational agencies. *See, e.g.,  A.R. v. Conn. State Bd. of  Educ.*, 5 F.4th 155, 167 (2d Cir. 2021) ("we see no abuse of discretion in the district court's order that the Board provide appropriate plaintiff class members with compensatory education"); *K.O. v. Jett*, No. 21-CV-1837 (PJS/DJF), 2023 U.S. Dist. LEXIS 149745, at *16, 2023 WL 551981 (D. Minn. Aug. 25, 2023)(ordering the Commissioner of the Minnesota Department of Education  to "provide compensatory education to class members who turned 21 years of age prior to July 1, 2022").  Further, J.V.P. has a claim for

_____

[22] Plaintiffs have never argued that a claim for attorney's fees would affect whether this underlying legal claims are moot.  *See* Def. Response, Doc. 105, at 42

23

compensatory education claim for denial of education to age 22 based on the difference in the IEP he would have received for education designed for an end of eligibility date at age 22 in contrast to the IEP that was designed to end on his 21st birthday and did not change for many months after this litigation as filed.

In any event, Proposed Plaintiffs-Intervenors E.S., M.S., and their mother J.L., and M.T. and her mother L.T. have moved to intervene in this case. Doc. 103. E.S. is a nineteen-year-old student with an IEP and her sister M.S. is an eighteen-year-old student with an IEP, and both attend Eureka High School. J.L. Dec., ¶¶ 4-5, 14-15. M.T. is a sixteen-year-old high school student with an IEP at Rock Ridge High School in Columbia, Missouri. L.T. Dec., ¶¶ 4, 5. E.S., M.S., and M.T. all have disabilities that adversely affect their educational performance and, therefore, will not be able to earn a regular high school diploma. J.L. Dec.¶¶ 12, 18; L.T. Dec., ¶ 9. E.S., M.S., and M.T. would benefit from receiving special education and related service until their 22nd birthdays. J.L. Dec., ¶¶ 8-10, 19; L.T. Dec., ¶ 10.

C.S., D.S., Me.S, and their mother J.L. and M.K. and her parents A.K. and R.K., also propose to join the case as Plaintiffs-Intervenors.[3] J.L. Dec., ¶ 29; A.K. Dec., ¶2. C.S. and D.S. are 22 and Me.S. is 21; they all had their education terminated before their 22nd birthday and seek compensatory education as a remedy. J.L. Dec., ¶¶ 25, 28, 30, M.K. is 20, and her parents and legal guardians want her to have the option of continuing to receive special education and related services until her 22nd birthday. A.K. Dec.,¶¶ 4, 13. The claims of E.S., M.S., J.L., M.T. and L.T. and their parents J.L., L.T., R.K,, and A.K. are not moot.

---

[3] A proposed amended complaint-in-intervention will be filed with the reply suggestions in support of the motion to intervene.

24

II.     **The IDEA Requires Defendants to Provide FAPE to Students until their 22nd Birthday as Doing So Is Not Inconsistent with State Law and Practice**

Missouri's state law and practice does, in fact, allow public education for students aged 21 and above. Because much of Defendants' argument is identical to the argument made in its suggestions in support of its motion for summary judgment (Doc. 99, at 7-13), Plaintiffs incorporate herein their suggestions opposing Defendants' motion for summary judgment and reply only to the additional points added in the Defendants' suggestions in opposition to Plaintiffs' motion for summary judgment.

First, although the IDEA uses the term "child with a disability" for all eligible students regardless of their age, including those age 18 to 22, 20 U.S.C. § 1401(3), in many states, including Missouri, "a person over the age of 18 is no longer a 'child' – that is, a 'minor.'" *See J.S. v. N.Y. State Dep't of Corr.*, 76 F.4th 32, 41 (2d Cir. 2023). Defendants' argument that public education that is entitled "adult education" does not count as education provided to "children in those age ranges" (between 21 and 22) because the statute refers to children of that age is nonsensical. *See* Doc. 105, at 43. Defendant acknowledges that the three circuit courts that have reached the issue in this case looked at the substance of the education provided to determine whether it had "a goal to obtain proficiency associated with secondary-level achievement." Doc. 105, at 47. *See* A.*R. v. Conn. State Bd. of Educ.*, 5 F.4th 155, 165 (2d Cir. 2014); *K.L. v. R.I. Bd. of Educ.*, 907 F.3d 639, 651 (1st Cir. 2018); *E.R.K.* v. *State Dep't of Educ.*, 728 F.3d 982, 990 (9th Cir. 2013).

Second, Defendants continues to argue that the unanimous decisions by three circuit courts on this issue are "a minority interpretation," even though they cannot point to a single court decision that supports their position. *See* Doc. 105, at 48. Further, they have not acknowledged the most recent court decision on this issue, by the United States District Court for

25

the District of Minnesota, which is in the Eighth Circuit. *K.O.*, 2023 U.S. Dist. LEXIS 149745, at

\*15-16. That court held that the Minnesota statute in effect prior to July 1, 2023 denied special

education to students who had not received high school diplomas and who had not yet turned 22,

in violation of the IDEA. *Id.* Defendants also failed to acknowledge that just this year the

Minnesota statute was amended on July 1, 2023 to provide: "Notwithstanding any age limits in

laws to the contrary, special instruction and services must be provided from birth until the child

with a disability becomes 22 years." Minn. Stat. Ann. § 125A.03(b), amended by Chapter 55,

Article 7, Section 7.  Further, in August, Pennsylvania also changed its policy to allow for

education to the 22nd birthday.  *See* Doc. 106 at 9-10. As Plaintiffs noted in their response to

Defendants' motion for summary judgment, many of the state statutes that are cited by

Defendants provide for education beyond the 21st birthday, and even if the state statutes do not

explicitly provide for education beyond the 21st birthday, some of the states have policies that

provide for education to the 22nd birthday and even in some cases beyond.  *See id*. at 10.

 The decisions by the First, Second, and Ninth Circuit Courts of Appeal as well as the

recent decision by the United States District Court for the District of Minnesota are persuasive.

For the same reasons as those courts articulated, IDEA requires Missouri to provide special

education to students until their 22nd birthday.  Therefore, Plaintiffs' Motion for Summary

Judgment should be granted and Defendants' Motion for Summary Judgment should be denied.

## **CONCLUSION**

 WHEREFORE, relying on the arguments made in their opening suggestions in support of

this motion, their response to Defendants' Motion for Summary Judgment, and this reply, as well

as all the exhibits and declarations provided by Plaintiffs, Plaintiffs respectfully request that this

Court deny Defendants' Motion for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment.

Date:  October 3, 2023

Respectfully submitted,

*s/Ellen Marjorie Saideman*
Ellen Marjorie Saideman RI Bar #02806
Law Office of Ellen Sideman
7 Henry Drive
Barrington, RI 02806
Tel: 401-258-7276
esaideman@yahoo.com
Admitted *Pro Hac Vice*

*/s/ Will Hack*
Will Hack MO Bar #69110
MO Protection and Advocacy Services
P.O. Box 140195
St. Louis, MO 63114
Tel: 314-256-9865
Fax: 573-298-6426
Will.hack@mo-pa.org

*/s/ Samara N. Klein*
Samara N. Klein
KLEIN LAW FIRM
9229 Ward Parkway, Suite 370
Kansas City, MO  64111
Tel: 816-682-3080
Fax: 816-523-5667
sklein@sklein-law.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was delivered on October 3, 2023 to Eric Doner, counsel for Defendant Missouri State Board of Education and Defendant Missouri Department of Elementary and Secondary Education, by ECF.


_s/Ellen Marjorie Saideman_
Ellen Marjorie Saideman